# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
**FOAD FARAHI**                                    )
                                                   )
       **Plaintiff**                          )
                                                   )      **Civil Action No. 15-2122 (RBW)**
       **v.**                                )      **(ECF)**
                                                   )
**FED. BUR. OF INVESTIGATION,**                    )
                                                   )
       **Defendant.**                         )
_____)


## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CHARLES SWIFT, D.C. Bar # 987353
Constitutional Law Ctr. for Muslims in America
833 East Arapaho Road, Suite 102
Richardson, Texas 75081
Phone: (972) 914-2507
Fax: (972) 692-7454
*Attorney for Plaintiff*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................... iii

**INTRODUCTION** .................................................................................................... 1

**BACKGROUND** ...................................................................................................... 1

   **A.  Legal Background of FOIA** ........................................................................ 1

   **B.  Background on Plaintiff** ............................................................................ 2

      1.   Personal History ...................................................................................... 2

      2.   Immigration History ................................................................................ 6

      3.   Records Request and Agency Response ................................................. 7

**STANDARD OF REVIEW** ...................................................................................... 8

**ARGUMENT** .......................................................................................................... 9

   **A.  FOIA Exemption 7(A)** ............................................................................... 10

      1.   Disclosure Will Not Impact Criminal Enforcement Proceedings .......... 11

      2.   Disclosure will not impact immigration enforcement proceedings ........ 15

      3.   National Security Concerns ..................................................................... 16

   **B.  Remaining Exemptions** ............................................................................. 17

**CONCLUSION** ....................................................................................................... 18

**CERTIFICATE OF SERVICE** ............................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ... 8

*Bigwood v. United States Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 74 (D.D.C. 2007) .............. 9

*Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) .................................................................. 1

*Diamond v. Atwood*, 43 F.3d 1538, 1540, 310 U.S. App. D.C. 113 (D.C. Cir. 1995).................. 8

*Elec. Frontier Found. v. Dep't of Justice*, 826 F. Supp. 2d 157, 2011 (D.D.C. 2011) ................ 18

*Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 76 (D.C. Cir. 1982) ............................................ 1

*Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006) .................................... 9, 10, 17

*King v. DOJ*, 830 F.2d 210, 219 (D.C. Cir. 1987) ....................................................................... 17

*Lardner v. FBI*, 852 F. Supp. 2d 127, 137 (D.D.C. 2012) ........................................................... 17

*Lester v. Natsios*, 290 F. Supp. 2d 11, 19 (D.C. Cir. 2003) .......................................................... 8

*Mapother v. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)....................................... 10, 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) .................................................................................................................... 9

*McErlean v. United States Dep't of Justice*, 1999 U.S. Dist. LEXIS 15544, No. 97 CIV. 7831(BSJ), *8 (S.D.N.Y. Sept. 30, 1999) ..................................................................... 16

*Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977) ................ 9

*Mittleman v. Office of Personnel Mgmt.*, 316 U.S. App. D.C. 187, 76 F.3d 1240, 1243 (D.C. Cir. 1996)................................................................................................................................. 15

*Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007) ............................................................... 17

*Neuman v. United States*, 70 F. Supp. 3d 416, 424-25 (D.D.C. 2014) ......................................... 17

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)................................................... 1

*Oglesby v. Dep't of the Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996) ................................................ 9

*Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242 n. 4, 288 U.S. App. D.C. 384 (D.C. Cir.

    1992) ................................................................................................................. 18

*Sussman v. United States Marshals Serv.*, 494 F.3d 1106, 1114 (D.C. Cir. 2007) ................ 10, 18

*U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989) ....... 1

*U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) ............................................................... 2

*United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) ............. 9

*Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973) .............................................................. 8

## Statutes

18 U.S. Code § 3286(a) ............................................................................................................... 14

18 U.S.C 3286(a) ........................................................................................................................ 15

18 U.S.C. § 3282 ........................................................................................................................ 14

18 U.S.C. 3293(2) ...................................................................................................................... 14

18 U.S.C.§ 2339B ...................................................................................................................... 14

5 U.S.C. § 552 ..................................................................................................................... 1, 2, 9, 17

## Other Authorities

Executive Order 12947 .............................................................................................................. 13

Executive Order 13224 .............................................................................................................. 13

## Rules

Fed. R. Civ. P. 56 ....................................................................................................................... 8

## INTRODUCTION

Congress passed the Freedom of Information Act ("FOIA") to enforce "the citizens' right to be informed about 'what their government is up to.'" *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989). FOIA (along with the Privacy Act of 1974) allows citizens to access records about themselves in the possession of federal agencies. *See* 5 U.S.C. § 552a(d). Together, these acts "evidence Congressional concern with open government, and especially, accessibility to government records," thereby fostering an informed citizenry and an accountable government. *Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 76 (D.C. Cir. 1982).

Defendant Agency defaulted on its legal obligation to fully respond to Plaintiff Farahi's requests. Defendant dragged its feet in processing the requests, mischaracterized the careful language, claimed nonexistent exemptions, and ultimately denied Plaintiff the access statutorily guaranteed to citizens under the FOIA. In short, the Defendant Agency fell short at every stage of the process - from the initial requests to the present litigation.

Now, Defendant Agency requests summary judgment. The Court should deny that motion. To green light agencies' inadequate responses would be to eviscerate the guarantees of FOIA.

## BACKGROUND

### A.  Legal Background of FOIA

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242 (1978). Congress passed FOIA in order "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (internal quotation marks

and citations omitted). The statute mandates that agencies produce records upon request unless an enumerated exemption applies. 5 U.S.C. § 552(a)(3). In view of FOIA's "purpose, as well as [its] plain language . . . , the strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).

## B.  Background on Plaintiff

As will be shown in the following personal history of Plaintiff Farahi, including his associations with individuals and organizations, and his immigration case history, it becomes abundantly clear that the claim made by the Defendant Agency that the release of the FOIA materials requested will jeopardize ongoing law enforcement investigations is patently false. Plaintiff Farahi's counsel was directed by the immigration court in Florida to commence FOIA litigation to obtain documents to support or refute pending immigration litigation.  This was done in 2015 with the filing of this case.  To date, the reasons given for failing to releases requested materials have to do with the frustration of justice in Plaintiff Farahi's immigration proceedings, and not any sort of ongoing law enforcement investigations, as claimed by the Defendant Agency, and as shown in the Declaration of David Hardy, filed with the Defendant's Motion for Summary Judgment.  *See* DKT 37-3.

### 1.  Personal History

Plaintiff Foad Farahi is a 45 year old man born in Kuwait to a father who is a citizen of Iran, and a mother who was born in Syria.  The citizenship of his father was conferred on Mr. Farahi, although Mr. Farahi has never once been to Iran.  As the dependent child of a resident of Kuwait, he had a Kuwaiti resident visa and was allowed residence and education in Kuwait, but had no right to work in Kuwait.  At age 19, Mr. Farahi went to the United States as a student on

an F-1 visa.  In the U.S. he studied chemistry and science at the university level.  He has resided

in the U.S. since this time.  As Mr. Farahi was out of Kuwait for more than six months when he

first came to the U.S., his Kuwaiti visa expired.  He is now unable to return to Kuwait to see his

family who live there now, and in fact has not seen his family since he left Kuwait at age 19.  Mr.

Farahi is also a member of the Sunni sect of Islam, which is a "disfavored" sect in many parts of

the world and especially in Iran.  As he is an Iranian citizen (although he has never been to Iran),

he cannot return to Kuwait. If he does not stay in the U.S., he would be required to move to Iran,

the country of his citizenship.  "Returning" to Iran would subject him to certain hardship and likely

to torture, due to his religious beliefs, as well as his prior study and residency in the U.S. and his

"American education."  As such, after over a decade of trying to obtain an adjustment of status to

allow him to stay in the United States, Mr. Farahi has a current asylum application pending in

immigration court in Miami, Florida, which is detailed at greater length below.

Mr. Farahi was approached and interviewed by the FBI in 2004. The FBI then began

alleged law enforcement investigation looking into Mr. Farahi's purported and non-existent

associations with organizations and individuals, for whom the need for criminal and/or law

enforcement scrutiny had long since expired. *See* Exhibit A - Passim.  For example:

- The FBI investigated Mr. Farahi's associations with José Padilla, who lived in

  southern Florida.  He first met Padilla in 1994 when they attended the same mosque

  (Darul Uloon Mosque), where Mr. Farahi was teaching Arabic and Padilla was one

  of his students. Later, Mr. Farahi offered Padilla a job at the fast-food chicken

  restaurant, Chicken Plus, which Mr. Farahi owned.  Padilla worked there for about

a year from 1997-1998.  This investigation of the relationship between Mr. Farahi and Padilla was conducted well after Padilla was arrested in 2002.[1]

- Mr. Farahi was tangentially associated with the Holy Land Foundation ("HLF"). HLF was designated a Foreign Terrorist Organization ("FTO") in 2001.  HLF went on trial, and ultimately its board members were convicted in 2008.  Mr Farahi's name continued to be used in conjunction with HLF, though no substantive associations were clear and no prosecution was instigated against Mr. Farahi.[2]

---

[1] **History of Padilla Investigation**:  José Padilla is a United States citizen from Brooklyn, NY, who was convicted in federal court of aiding terrorists. Padilla was arrested in Chicago on May 8, 2002, on suspicion of plotting a "dirty bomb" attack. He was detained as a material witness until June 9, 2002, when President Bush designated him an enemy combatant and, arguing that he was not entitled to trial in civilian courts, he was transferred to a military prison in South Carolina. Padilla was held for three and a half years as an enemy combatant. He was transferred to a civilian jail in 2006. In August 2007, a federal jury found him guilty of conspiring to commit murder and fund terrorism. Government officials had earlier claimed Padilla was suspected of planning to build and explode a "dirty bomb", but he was never charged with this crime. He was initially sentenced to 17 years in prison, which was increased on appeal to 21 years. (https://en.wikipedia.org/wiki/Jos%C3%A9_Padilla_(prisoner))

[2] **History of Holy Land Foundation (HLF):** The Holy Land Foundation (HLF) was the largest Islamic charity in the United States. Headquartered in Richardson, Texas, and run by Palestinian-Americans, HLF claimed its mission was to "find and implement practical solutions for human suffering through humanitarian programs that impact the lives of the disadvantaged, disinherited, and displaced peoples suffering from man-made and natural disasters." In December 2001, the U.S. government designated HLF a terrorist organization, seized its assets, and closed the organization after many years of surveillance authorized under the Foreign Intelligence Surveillance Act ("FISA").  In 2004, HLF and five former officers and employees with providing material support to Hamas and related offenses. The prosecution's theory was that HLF distributed charity through local zakat (charity) committees located in the West Bank that paid stipends to the families of Palestinian suicide bombers and Hamas prisoners; that Hamas controlled those zakat committees; that by distributing charity through Hamas-controlled committees, HLF helped Hamas build a "grassroots" support amongst the Palestinian people; and that these charity front organizations served a dual purpose of laundering the money for all of Hamas's activities.  The first trial, in 2007, ended in the partial acquittal of one defendant and a hung jury on all other charges. At a retrial in 2008, the jury found all defendants guilty on all counts. Sentencings occurred in 2009, and the HLF litigation effectively ended. (https://en.wikipedia.org/wiki/Holy_Land_Foundation_for_Relief_and_Development )

Apparently Mr. Farahi had placed a coin box collection for HLF at his fast-food chicken store.

- The FBI investigated Mr. Farahi's association with Global Relief Foundation ("GRF"). GRF was designated as an FTO and closed down in 2002.[3]

- The FBI investigated Mr. Farahi's association with KindHearts charity, specifically donations made and fundraising done by Mr. Farahi. KindHeart's assets were frozen in 2006 pending designation as a FTO. Mr. Farahi's association with KindHearts continued to be investigated even after KindHeart's litigation was completed in 2011.[4]

While the FBI has claimed these investigations were for law enforcement investigation, it was more specifically done in an effort to show "Bad Moral Character" and frustrate Mr. Farahi's adjustment in Status and Asylum litigation in immigration court. *See* Exhibit A – Passim.

---

[3] **History of The Global Relief Foundation ("GRF")**:  GRF was an Islamic charity based in Bridgeview, Illinois, until it was raided and shut down on December 14, 2001, and listed among the "Designated Charities and Potential Fundraising Front Organizations for Foreign Terrorist Organizations" by the United States Treasury Department in 2002. According to the U.S. Treasury, "The Global Relief Foundation (GRF) … and its officers and directors have connections to, and have provided support for and assistance to, Osama bin Laden (OBL), al Qaeda (aQ), and other known terrorist groups (OKTG)."[1] It was one of the few organizations registered with the Taliban. (https://en.wikipedia.org/wiki/Global_Relief_Foundation )

[4] **History of KindHearts:**  "KindHearts" was a non-governmental organization operating out of Toledo, Ohio. The organization's stated goal was to provide "humanitarian aid without regard to religious or political affiliation." KindHearts seemed to take up where HLF left off after indictment.  On February 19, 2006, the U.S. Treasury froze the assets of KindHearts after finding the charity to be fundraising for Hamas. KindHearts reached a settlement agreement with the U.S. Treasury in November, 2011, ending a protracted legal dispute over the charity's fundraising activities and its alleged affiliation with terrorist groups. KindHearts officially disbanded in February, 2012 after distributing its funds to various humanitarian causes.  Treasury removed KindHearts from the list of designated terrorist organizations, thus closing the chapter on KindHearts in 2012.
 (https://en.wikipedia.org/wiki/KindHearts_for_Charitable_Humanitarian_Development )

### 2. Immigration History

Foad Farahi has been trying to adjust his immigration status for going on two decades now. He originally came to the U.S. on a student visa.  He sought to adjust his status when he married his U.S. citizen wife.  He applied for asylum on at least two occasions, both after his student visa expired, and after his divorce.  Asylum litigation is currently pending in immigration court in Miami, Florida.  Below is a brief timeline of his immigration matter:

• 1993:  Mr. Farahi comes to the U.S. on student visa.

• 1999:  Mr. Farahi's student visa expires.  He tries to renew status through his first school, and later through a second school.

• 2001:  Mr. Farahi's student status was not renewed because he failed to timely respond to government request for evidence.

• 2002: Mr. Farahi applies for asylum due to changing conditions in the country of his citizenship (Iran) and the perils he would face if forced to leave for Iran.

• 2007: Mr. Farahi was pressured to withdraw asylum by his immigration judge and by the FBI and to take voluntary departure. The stated reason for not granting asylum was "Bad Moral Character".

• 2010: Board of Immigration Appeals remands proceedings back to Immigration Court due to changed country conditions in Iran, for adjudication of asylum application.

• 2011 through 2017: Mr. Farahi has pursued his of adjustment of status ("AOS") through his United States citizen ("USC") spouse. Many continuances were granted due to pending FOIA litigation (before this Court), due to government requests and Court docket issues.  Counsel was directed to file FOIA litigation to access information about any "Bad Moral Character," which resulted in this litigation in 2015 in this District to obtain the needed materials.

•      2018:  Due to the divorce between Mr. Farahi and his USC spouse, an adjustment of status was pretermitted over Respondent's (government) objections.

•      2019: Mr. Farahi presented his submission of asylum evidence.

•      December 23, 2019:  An all-day Individual Hearing to adjudicate asylum, withholding of removal, and torture protection applications took place in Miami, Florida.

•      Mr. Farahi's case is currently held in abeyance for written decision.

•      Both parties now have until January 22, 2020, to submit evidence regarding whether Kuwait ever offered Mr. Farahi permanent residency such that he would be ineligible for asylum (not withholding or torture protection).

As of the filing of Plaintiff's Opposition to the Defendant's Motion for Summary Judgment, the record on Mr. Farahi's immigration case is not yet closed, and as such, there is an immediate and real relevance to the FOIA request for the requested materials and information.[5]

### 3.  Records Request and Agency Response

Over the course of five and a half years since the first FOIA request in this matter dated June 28, 2014, the Defendant has reviewed close to 4,000 documents without making a single disclosure, stating "With the exception of public source information, the files responsive to Plaintiff's request have been denied in their entirety."[6]  The *Vaughn* index provided by the Defendants was similarly bereft of information. Without sufficient details, Plaintiff is unable to evaluate the applicability of the claimed exemptions and as a result, is unable to file any sort of cross-motion for summary judgment, and cannot fully prepare any briefing. "The need for adequate specificity is closely related to assuring a proper justification by the governmental

---

[5] USCIS Removal Proceeding, Miami, Florida in the matter of Foad Kareem Farahi:  A-Number 096087879.
[6] Declaration of David Hardy, DKT 37-3, pg. 33.

agency."[7]  Without such specificity, the burden is placed "on the party seeking disclosure, in clear contravention of the statutory mandate."[8] The Defendant Agency also submitted an 80 page Declaration of David Hardy, *ex parte* and *in camera* to this Court, explaining what was reviewed, and general reasons as to why the documents could not be disclosed.  Plaintiff Farahi, again, has only received general stated exemptions, and as such is not able to sufficiently challenge the same. In the Joint Status Report dated June 26, 2019, DKT 32, the Defendant Agency's position was that "any alleged inadequacy or deficiency in its *Vaughn* Declaration should be litigated in the context of summary judgment briefing." However, Plaintiff Farahi has been precluded from participating in this "summary judgment briefing" as Plaintiff was provided no meaningful understanding of the reasons for the documents being withheld.

## **STANDARD OF REVIEW**

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56 (a) and (c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540, 310 U.S. App. D.C. 113 (D.C. Cir. 1995). An issue is genuine and material if a "reasonable trier of fact could return judgment for the non-moving party," and the fact "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. "The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact." *Lester v. Natsios*, 290 F. Supp. 2d 11, 19 (D.C. Cir. 2003). On summary judgment, all evidence and inferences to be drawn from

---

[7] *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973).
[8] *Id.* at 828.

the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *United States v. Diebold, Inc*., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962). The Privacy Act and FOIA both authorize a federal court to review an agency's refusal to comply with an individual records request *de novo*. 5 U.S.C. §§ 552(a)(4)(B), 552a(g)(2)(A).

## **ARGUMENT**

The Defendant Agency primarily invokes the law enforcement purposes exemption under FOIA Exemption 7(A), arguing that the information could reasonably be expected to interfere with law enforcement proceedings. In addition to 7(A), the Defendant Agency invokes particularized exemptions for each document or portions thereof. In addition to FOIA Exemption 7(A), the Defendant Agency also asserts FOIA Exemptions 1, 3, 5, 6, 7(C), 7(D), and 7(E).

The Defendant Agency bears the burden of persuasion in invoking each exemption. *See Bigwood v. United States Agency for Int'l Dev.,* 484 F. Supp. 2d 68, 74 (D.D.C. 2007). To meet this burden, the Defendant Agency must provide a detailed description of information withheld. The government ordinarily meets this requirement through the submission of a *Vaughn* Index. *See id*.; *see also Oglesby v. Dep't of the Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996). While there is no particular format for a *Vaughn* Index, the Index and/or the accompanying affidavits must "provide a relatively detailed justification, specifically identif[y] the reasons why a particular exemption is relevant and correlat[e] those claims with the particular part of a withheld document to which they apply." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006) (quoting *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977).

Here, the Defendant Agency relies on the declaration of David M. Hardy, the Section Chief of the Record/Information Dissemination Section of the Information Management Division of the FBI, filed in open court, and two *ex parte* affidavits filed by a retired FBI agent and an FBI Agent in the Miami Field Office, indicating that the investigation is ongoing. *See* DKT 37-3.

## A. FOIA Exemption 7(A)

To demonstrate that reliance on Exemption 7 is proper, the Defendant Agency must make at least a minimum showing concerning "the impact of the disclosures" if the documents were disclosed. *Sussman v. United States Marshals Serv.*, 494 F.3d 1106, 1114 (D.C. Cir. 2007). Exemption 7(A) is properly invoked where "disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1993). Mr. Hardy's declaration is insufficient in and of itself to satisfy these requirements. Concerning the ongoing investigation, Mr. Hardy merely recites generic concerns regarding the potential release predicated on an assertion that an ongoing investigation exists into Plaintiff Farahi's conduct, raising the potential for future prosecution. Generic reasons, however, are insufficient to satisfy the defendant's burden. *Judicial Watch, Inc.*, 449 F.3d at 150.

Most importantly here, however, is the claimed viability of a future prosecution against Plaintiff Farahi or persons or organizations associated with his investigation. Mr. Hardy states that:

> Any release of information from these files to Plaintiff would be premature and likely to cause harm. The ongoing investigations are related to Farahi and others, and release of the requested information would allow such individuals to critically analyze documents concerning these international terrorism investigations. Such individuals possess the unique advantage of knowing the details surrounding the potential criminal activities, the identities of potential witnesses, and the direct and circumstantial evidence of the potential criminal activities.

These individuals could therefore use the released information to their advantage to alter, destroy, create false evidence, intimidate potential witnesses, adjust patterns of behavior to avoid detection and/or mislead investigations. In this regard, the following potential harms from the release of information contained in these documents exists:

(a) the identification of individuals, sources, and potential witnesses who possess

information relative to the investigation and possible harm, harassment, or intimidation of these individuals;

(b) the use of released information to counteract evidence developed by investigators,

alter or destroy potential evidence or create false evidence;

(c) the use of information released to uncover the government's trial strategy; and

(d) the use of released information by any subject of the investigation to assess the

likelihood that he or she may be prosecuted and/or convicted in connection with

this investigation.

(e) the use of released information by any subject to adjust behaviors to avoid

detection of ongoing criminal activities or mislead investigations

(69) Furthermore, the risk of interference is accentuated here, sine once a release is made to Plaintiff under the FOIA, his use and dissemination of the information to third parties is unrestricted.

DKT 37-3 at 27.

Mr. Hardy also references statements of the retired agent and the Miami Field Office of the FBI for the proposition that the investigation into Plaintiff Farahi is ongoing. Plaintiff, of course, is unable to address the sufficiency of the additional information provided to the Court in *ex parte* declarations. Plaintiff nevertheless urges the Court to view the claim of interference with potential enforcement proceedings that are pending or reasonably anticipated with skepticism.

## 1. Disclosure Will Not Impact Criminal Enforcement Proceedings

Despite the claim of an ongoing investigation, the length of the purported investigation, approximately seventeen years at this point, strongly weighs against any claims that the release of the materials would jeopardize criminal enforcement proceedings.

The investigation into Plaintiff Farahi, which the Defendant Agency claims is ongoing and would be jeopardized by the release of any relevant documents, apparently began in 2003 when a confidential source reported that Plaintiff was a member of the Muslim Brotherhood and had attempted to recruit him into the Muslim Brotherhood.[9]  Apart from the allegation that Plaintiff was a Muslim Brotherhood recruiter, the investigation, at least initially, also apparently concerned Plaintiff's contacts with José Padilla, who had worked at the Chicken Plus restaurant owned and operated by Plaintiff Farahi from 1997 to 1998. Exhibit A at 9. In addition to Padilla, Plaintiff Farahi had also had contact with Adham Hassoun ("Adham"). Adnan was the son of the imam of the Shamsuddin Mosque in Miami, Florida, whom Plaintiff trained under and later assumed the duties from as imam of the mosque. Exhibit A at 10.

Both Padilla and Adham were arrested and tried on terrorism related charges. José Padilla was initially detained in Chicago, Illinois, as a material witness. He was subsequently transferred to Charleston, South Carolina, and detained as an enemy combatant on information that he had traveled to the United States as an agent of Al-Qaeda with instructions to conduct attacks against the United States. Padilla challenged his detention, and while that suit was pending he was indicted in the Southern District of Miami on charges of providing material support to a terrorist organization and conspiracy to murder, kidnap and maim people overseas. Padilla was convicted of these charges in August 2007 and is currently serving a 21-year prison sentence.[10] Likewise, Adham was convicted in 2007 on charges of conspiracy and material support of a terrorist organization. He was sentenced to a prison term of 15 years, 8 months, and at the completion of

---

[9] The Muslim Brotherhood is not a designated terrorist organization and membership in it, or recruiting for it, therefore, would not constitute a prosecutable crime.

[10] Kirk Semplejan. *"José Padilla sentenced to more than 17 years in prison". The New York Times. January 22, 2008.*

that sentence he was ordered imprisoned for the rest of his life because he is stateless and not deportable.[11]

Apart from Plaintiff's contacts with the above individuals, the investigation also apparently concerned Plaintiff's association with three organizations that were designated in some form as terrorist organization financiers. The first of these organizations was HLF in Richardson, Texas. HLF was designated by the United States Department of Treasury under Executive Orders 13224 and 12947 as a charity that provided millions of dollars and material support to Hamas in November of 2001. HLF's assets were seized, effectively ending the organization as an entity. Exhibit A at 8. HLF and its directors were later indicted in 2004 for material support of Hamas and some of its officers were convicted of charges related to the material support of terrorism. The Plaintiff's only connection to HLF was that a collection box for HLF was located in the Plaintiff's Chicken Plus restaurant, and on occasion the Plaintiff sent the collected donations in the box to HLF, at the time the largest Islamic charity in America.

Plaintiff was also connected with GRF. Like HLF, GRF was similarly designated as a terrorist financier by the United States Department of Treasury under Executive Order 13224 in November of 2001 and its assets were seized. This again effectively ended the organization as an entity. Unlike HLF however, no director or officer of GRF was ultimately charged with terrorism-related charges. Plaintiff Farahi's involvement with GRF is alleged to have been as a fundraiser for GRF at local events.

Plaintiff is also alleged to have been a fundraiser for KindHearts International. In 2006, KindHearts' assets were blocked and frozen by the Office of Foreign Assets Control (OFAC) while

---

[11] Spencer Ackerman (2019-11-29). "Trump Is First to Use PATRIOT Act to Detain a Man Forever". *Daily Beast*. November 29, 2019.

OFAC investigated whether the funds or a portion of the funds that KindHearts provided for humanitarian relief in Palestine and Lebanon were being utilized by designated terrorist groups or groups controlled by a designated terrorist group. KindHearts opposed the blocking action in federal court, the litigation ultimately ended in 2012 with KindHearts being de-listed by OFAC and the blocked funds being released for distribution. As KindHearts ceased to exist due to the blocking order, these funds were distributed to other humanitarian causes with government approval, and at the close of litigation the government paid KindHearts' legal fees, further indicating KindHearts having prevailed in its action.

Plaintiff maintains that release of documents related to his alleged associations with these persons and organizations will not jeopardize law enforcement proceedings. The statute of limitations for material support of a terrorist organization under 18 U.S.C.§ 2339B is eight years. 18 U.S. Code § 3286(a). The statute of limitations for financially related crimes such as money laundering and mail fraud is ten years. 18 U.S.C. 3293(2).  The statute of limitations for RICO violations, which are alternatively used in some prosecutions, is five years. 18 U.S.C. § 3282. All of these statutes of limitations have long since passed.

HLF was prevented from making further financial contributions to Hamas based on government action in 2001. Additionally, because HLF ceased to exist as an entity, related conspiracy and RICO charges were likewise limited by government action in 2001. GRF was also prevented from further financial transactions potentially benefitting Al Qaeda in 2001 and similarly ceased to exist as an entity thereby starting the statute of limitations for any conspiracy or RICO charge. Accordingly, any charge related to Plaintiff Farahi's alleged activities in conjunction with HLF or GRF would have had to have been initiated no later than 2011.

Similarly, José Padilla and his alleged co-conspirators were arrested in 2002 and were tried for their activities in August 2007; the statute of limitations for those activities therefore expired in 2010. Even if the government were still investigating the potential prosecution of Padilla and persons associated with him regarding alleged activities before 2002 related to potential acts of terrorism in the United States, the statute of limitations for these acts is eight years. 18 U.S.C 3286(a). Any purported conspiracy related to this activity involving Plaintiff necessarily was terminated by Padilla's apprehension and detention in May 2002.

Finally, Adham was apprehended in 2002 and tried in 2007. Again, Adham's detention eliminates any potential conspiracy thereby starting the statute of limitations for conspiracy to provide material support to a terrorist organization (in Adham's case, Al-Qaeda). The statute of limitations for charges related to potential support expired in 2010.

In summary, disclosure of documents related to investigation of Plaintiff's connections with each of these individuals and organizations will not jeopardize a law enforcement action because such an action for each of the above individuals and organizations is no longer viable.

## 2. Disclosure will not impact immigration enforcement proceedings

Mr. Hardy's declaration exclusively references criminal proceedings which, for the reasons stated above, are no longer viable and therefore not likely to be impacted. Law enforcement grounds, for the purposes of the FOIA, however, are not limited only to criminal investigations, but also includes within its scope civil investigations and proceedings as well as regulatory proceedings. *Mittleman v. Office of Personnel Mgmt.*, 316 U.S. App. D.C. 187, 76 F.3d 1240, 1243 (D.C. Cir. 1996); *see also Mapother* 3 F.3d 1533 at 1540. Accordingly, investigative records compiled in conjunction with immigration proceedings have been recognized as within "'law

enforcement purposes' within the meaning of Exemption 7." *McErlean v. United States Dep't of Justice*, 1999 U.S. Dist. LEXIS 15544, No. 97 CIV. 7831(BSJ), *8 (S.D.N.Y. Sept. 30, 1999).

Unlike a criminal prosecution, there is no statute of limitations concerns with the use of information in immigration proceedings, and therefore the use of the records could theoretically be withheld under an alternative administrative prong. Indeed, the immigration proceedings concerning Plaintiff Farahi are ongoing, and it is unknown whether the *ex parte* declarations raise this concern. To the extent that they do so, the Court should again find against Defendant Agency on a generic claim.

In this case the Plaintiff's immigration proceedings have been ongoing since 2007. However, the submission of evidence in the Plaintiff's deportation proceedings is now almost concluded with final filings due on January 22, 2020.  As such, generic withholding his inappropriate under an alternative immigration proceedings rationale.

### 3.  National Security Concerns

Within Defendant Agency's rationale for withholding under Exemption 7(A), Mr. Hardy makes repeated claims concerning the potential impact on national security under Exemption 7(A) disclosure. Plaintiff Farahi submits that the court should disregard such claims in conjunction with the 7(A) disclosure. National security concerns are certainly addressed in the exemptions permitted under FOIA: specifically, Exemptions 1 and 3 permit the withholding of information that would cause direct harm to national security. Indeed, Congress has passed statutory exemptions for such materials. Accordingly, the government should not be able to create a special class of investigations related to national security that operate under rules differing from those passed by Congress. If Congress wanted to make national security concerns a special exemption for law

16

enforcement purposes, it could do so. This Court should not accept Defendant Agency's invitation to create a special classification involving so-called national security cases.

## B. Remaining Exemptions

Plaintiff opposes summary judgment on any of the remaining exemptions at this stage in the proceeding, because the affidavits submitted do not provide sufficient information for either Plaintiff or the Court to evaluate the appropriateness of the exemption.

Although a *Vaughn* index has "no set form," *Lardner v. FBI*, 852 F. Supp. 2d 127, 137 (D.D.C. 2012), Defendant Agency's listing must "enable the court and the opposing party to understand the withheld information in order to address the merits of the claimed exemptions." *Judicial Watch, Inc*., 449 F.3d at 150. To this end, a *Vaughn* index should "provide 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply[.]'" *Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (quoting *King v. DOJ*, 830 F.2d 210, 219 (D.C. Cir. 1987)).  Correlating the justification with a specific part of a document is of particular importance where Plaintiff is not contesting every exemption. *Neuman v. United States*, 70 F. Supp. 3d 416, 424-25 (D.D.C. 2014).

Indeed, just because a portion of a document may be withheld based on an exemption does not mean that Defendant Agency is free to withhold a document or documents in total based on the existence of exempt material therein. FOIA analysis is not properly concluded without this Court's determination of whether "any reasonably segregable portion of a record" can "be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "So important is this requirement that '[b]efore approving the application of a FOIA

exemption, the district court *must* make specific findings of segregability regarding the documents to be withheld.'" *Elec. Frontier Found. v. Dep't of Justice*, 826 F. Supp. 2d 157, 2011 (D.D.C. 2011) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 377 U.S. App. D.C. 460). The Court errs if it "simply approve[s] the withholding of an entire document without entering a finding on segregability or the lack thereof." *Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242 n. 4, 288 U.S. App. D.C. 384 (D.C. Cir. 1992).

In this case, the Hardy affidavit generically explains Defendant Agency's reasons for invoking the remaining exemptions without correlating the justification to any particular document, much less a specific portion of a document as required. As a result, there is no basis for this Court to determine whether the justification is appropriate for the material withheld, or whether the portions of the record are segregable and may be provided to Plaintiff. Accordingly, summary judgment is inappropriate on any of the alternative exemptions cited.

## CONCLUSION

Defendant Agency has fallen short of its obligations under FOIA. The FBI has not provided a meaningful *Vaughn* index to justify its withholdings, depriving Plaintiff and the Court of any means to evaluate its invoked exemptions. The FBI continues to assert that there is a continuing investigation, when any such investigating should be long since over or completed as to Plaintiff Farahi.  the law enforcement exception is no longer a valid reason to withhold documents.

For these reasons, this Court should deny Defendant Agency's Motion for Summary Judgment. The Court should further order the FBI to provide a *Vaughn* index justifying its withholding of virtually all documents requested, claiming a Law Enforcement/ Investigative Privilege; and order that the FBI either release these records or justify its withholding pursuant to legitimate FOIA exemptions.

January 17, 2020                              Respectfully submitted,


                                              /s/ *Charles Swift*
                                              CHARLES SWIFT, Esq., D.C. Bar # 987353
                                              Constitutional Law Ctr. for Muslims in America
                                              833 East Arapaho Road, Suite 102
                                              Richardson, Texas 75081
                                              Phone: (972) 914-2507

## CERTIFICATE OF SERVICE

I certify that, on this day, January 17, 2020, I caused a copy of the foregoing Memorandum in Support of Plaintiff's Response to the Government's Motion for Summary Judgment, to be served upon Defendant's counsel via ECF.

/s/ *Charles Swift*
CHARLES SWIFT, Esq., D.C. Bar # 987353
Constitutional Law Ctr. for Muslims in America